**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**THOMAS L. JUSTUS,**

        **Plaintiff,**

                                         **Civil Action 2:12-cv-126**
      **v.**                              **Judge Edmund A. Sargus**
                                         **Magistrate Judge Elizabeth P. Deavers**

**MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Thomas L. Justus, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 16), Plaintiff's Reply (ECF No. 17), and the administrative record (ECF No. 10). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff Justus protectively filed his application for benefits on June 24, 2009, alleging that he has been disabled since June 15, 2001, at age 26.  (R. at 169-71.)  Plaintiff alleges disability as a result of a knee injury, bipolar disorder, anxiety, degenerative disc disease, asthma, and a learning disability.  (R. at 250.)  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative Law Judge Mark Clayton ("ALJ") held a video hearing on July 19, 2011, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 32-83.)  Vocational Expert Barry Brown ("VE") also appeared and testified at the hearing.  (R. at 84-95.)  On September 16, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 8-18.)  On December 16, 2011, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-3.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified that he attended school until the tenth grade and had been placed in special education classes.  (R. at 35.)  If he were to write a simple note to his girlfriend, he would have to ask how to spell the words.  (R. at 35-36.)  He further testified that he can barely read and cannot count change on his own.  (R. at 36-37.)  Plaintiff testified that he worked for a couple of months in 2010 operating a weed-eater and picking up trash for Brickman Landscaping.  (R. at 43-44.)

Plaintiff lives in a two-story home with his mother, his girlfriend of eight years, and his three children, ages four, two, and three months.  Plaintiff testified that he could go up the stairs, but does not because it would hurt his knee and back.  (R. at 38-39.)  His mother and girlfriend prepare all of the household meals, perform all of the household chores, and care for Plaintiff's three small children.  (R. at 68, 74.)  He added that his girlfriend fills out all of his job applications because he cannot read or write and does not know how to use a computer.  (R. at 49.)  Plaintiff tries to help out with the kids and can change diapers and throw balls with his kids.  (R. at 75–76.)  He and his girlfriend watch television for fun.  (R. at 76.)  Socially, he occasionally goes out to eat or has his friends visit him.  (R. at 78.)  Plaintiff testified that although his license had been revoked fifteen years prior to the hearing, he has driven a couple of times to take his son to the hospital, the last time being two years prior to the hearing.  (R. at 40.)

Plaintiff testified that the most significant problem that prevents him from working is his lower back.  (R. at 49-50.)  Sitting and standing both cause pain.  (R. at 51.)  Plaintiff reported that he has experienced this pain for the past five to six years prior to the hearing.  (*Id.*)  He estimated that he could sit for about 10-15 minutes before he would have to move and stand for about 5 minutes.  (R. at 52.)  He further estimated that he could walk for about 5-7 minutes.  (R. at 53.)  He represented that he has torn ligaments and shattered bones in his left knee.  (R. at 59.)  Plaintiff testified that in 2006, he fell off a ladder when trying to change a light bulb.  (R. at 61.)  When asked about a December 2009 dirt bike accident, Plaintiff responded that he was not riding the dirt bike, but only sitting on it for a picture when he fell off and injured his back.  (R. at 62.)  Plaintiff testified that he has used a cane for five years but did not have it with him at the hearing as he had left it in his car.  (R. at 32.)  He obtained the cane without a prescription because his

knee goes out.  (R. at 32-33.)  He testified that he takes the cane with him every time he goes out in public.  (R. at 33.)

Plaintiff represented that he can barely lift his son who weighs 13.2 pounds due to carpal tunnel syndrome.  (*Id.*)  He indicated that he has suffered from carpal tunnel syndrome for about four years.  (R. at 54.)  Plaintiff also testified that he cannot work due to anger issues, with which he has struggled since he was a child.  (R. at 54.).  He noted that he has lost most of his jobs due to anger.  (R. at 54-55.)  Plaintiff asserted that his ability to work is also limited by Hepatitis C. (R. at 64.)  He also uses an inhaler once or twice a day and requires breathing treatments when exposed to extreme heat.  (R. at 66.)

**B.    Vocational Expert Testimony**

The ALJ proposed a series of hypotheticals to the VE regarding Plaintiff's residual functional capacity.  (R. at 84–95.)  The ALJ first asked the VE to consider an individual of Plaintiff's age andwork experience who was illiterate; limited to light exertional work with occasional climbing of ropes, ladders, scaffolds, ramps and stairs; could occasionally stoop, kneel, crouch, and crawl; could frequently balance; could frequently push, pull, and operate foot pedals with the left lower extremity; would need to avoid concentrated exposure to pulmonary irritants such as odors, dust, gas, fumes, poorly-ventilated areas, and extreme temperature changes; and who was further limited to simple, routine, repetitive tasks of no more than 3 to 4 steps, without fast-paced production or strict time quotas.  (R. at 90-91.)  Based on this hypothetical, the VE testified that Plaintiff could not perform his past relevant work, but that other light, unskilled jobs would be available at the local and national levels, such as inspector

(approximately 2,000 positions in Ohio), machine tender (approximately 2,200 positions in

Ohio), and merchandise marker (at least 5,000 positions in Ohio).  (R. at 91-92).

      The VE also clarified that his testimony differed from the *Dictionary of Occupational*

*Titles* ("DOT") as follows:

> I'd like to say that, with regards to all three of these jobs, they have GED levels of
> at least a 1 or 2, and what that means is, in the DOT it says that for these jobs a
> person may have to recognize the meaning of 2,500 two- or three-syllable words,
> possibly have to read up to a rate of 95 to 120 words per minute.  However, I can
> say, based on my professional experience, that these jobs that I've given, the
> reduced – extremely reduced numbers that I've given, demand no reading
> whatsoever, no writing whatsoever.  So it does deviate from the DOT."

(R. at 93.)

      The VE testified in response to the second hypothetical that a restriction of occasional

handling and fingering bilaterally would eliminate all the jobs he identified.  (R. at 93-94.)  The

ALJ next asked the VE to assume an individual would be off task 15 percent of a workday

excluding breaks.  The VE responded that this limitation would likewise eliminate all

competitive unskilled jobs.  (R. at 94.)  Finally, the VE testified that if an individual missed work

two unscheduled times per month on a regular, consistent basis, it would eliminate all jobs.  (*Id.*)

      Plaintiff's counsel was provided an opportunity to cross-examine the VE, but declined to

do so.  (R. at 95.)

### III.   EDUCATION RECORDS

      Plaintiff attended South-Western City Schools.  (R. at 367-76.)  A March 1991

Evaluation Team Report shows that Plaintiff was classified as learning disabled and that he

attended special education classes.  (R. at 376.)

## IV.    MEDICAL RECORDS

**A.    Physical Impairments**

**1.    Mount Carmel Medical Center**

In March 2005, Plaintiff presented to the emergency room with left knee pain after wrestling with a friend.  Plaintiff sustained a closed avulsion fracture of the proximal tibia.  (R. at 462.)  When seen in follow up, he was diagnosed with an ACL (anterior cruciate ligament) injury, a tear of the lateral meniscus, and a MCL (medial collateral ligament) injury.  (R. at 458-61.)  Plaintiff reinjured his knee in January and May 2006.  He was diagnosed with left knee pain with known internal derangement and chronic ligamentous left knee injury and advised to apply ice, use crutches, and wear a knee immobilizer until his condition improved.  (R. at 448-51.)

Plaintiff sought treatment for back pain in April 2007.  (R. at 430-34.)  He described his pain as a "10" on a 1-10 analog pain scale.  (R. at 430.)  Examination showed diffuse low and mid-back tenderness without palpable deformity.  There was no bony tenderness of the thoracic or lumbar spine.  There was tenderness and spasm of the thoracic and lumbar paraspinal muscles.  Deep tendon reflexes are brisk and symmetric.  Plaintiff's straight leg raise test was negative.  His motor strength in his lower extremities measured five out of five.  (R. at 431.)  He was diagnosed with lumbar strain and prescribed pain medications.  (R. at 434.)

In January 2008, Plaintiff returned to the emergency room a fourth time complaining of knee pain.  (R. at 418-22.)  He reported that he had been off work for several months and just returned three days prior.  He attributed his knee pain to his frequent climbing of ladders.  He represented that he has a history of a meniscal injury to his left knee.  He also reported that he

was too scared to undergo surgery that had been recommended.  (R. at 419.)  He was placed in a single schantz and told to follow up with an orthopedic surgeon.  (R. at 420.)

In June 2008, an x-ray of Plaintiff's lumbar spine revealed early spondylotic changes at the lower lumbar spine.  (R. at 671.)  A second lumbar x-ray performed in November 2009 showed mild lumbar degenerative changes in two vertebrae.  (R. at 921.)

Plaintiff next returned to the emergency department on December 27, 2009, complaining of back pain.  He reported that the pain began when he fell off a dirt bike he had been riding and landed on his back.  (R. at 874-79.)  He described his pain as a "9" on a 1-10 analog pain scale. (R. at 874.)  Examination revealed point tenderness with palpation over the lumbar spine, but no bony deformity, crepitus, or step off.  Plaintiff could dorsiflex his toes and had five out of five strength against resistance.  He could stand up on his toes and back on his heels.  Muscle strength was five out of five to the lower extremities against resistance.  His bilateral straight leg raise examination was negative.  He could squat down and return to a standing position.  He was ambulatory without an antalgic gait.  (R. at 876.)  X-rays of the lumbar spine showed no evidence of fracture or subluxation or spondylolisthesis.  (*Id.*)  Plaintiff was diagnosed with a back contusion and advised to follow up with his family physician.  (*Id.*)

### 2.     Doctors West Hospital

On December 17, 2007, Plaintiff presented to the emergency department with complaints of right hand and left ankle pain.  He reported that he was about 10 feet up on a roof hanging Christmas lights when he fell off the roof.  He landed on his left ankle and then fell from that position onto his outstretched dominant right hand.  He described right hand pain in the area of his fourth and fifth metacarpal bases.  Plaintiff denied any head trauma, headache, neck pain,

back pain, chest pain, shortness of breath, abdominal pain or vomiting.  (R. at 582-85.)
Examination showed no numbness or paresthesias in the hand at that time, but he was "globally
tender over the carpals" with "very mild wrist and distal radius tenderness."  (R. at 584.)
Radiology showed metacarpal base fractures of the right small and long fingers.  (R. at 585.)
Plaintiff's right hand was casted.

On February 17, 2009, Plaintiff was seen again in the emergency room for a right toe
fracture after dropping a washer on his foot the day prior.  (R. at 565.)  On February 25, 2009,
Plaintiff was seen for a chief complaint of right hand paresthesias and pain, which he reported
that he had been experiencing for four days.  (R. at 566.)  Examination revealed that he had full
range of motion of his wrist, could wiggle his fingers, full sensation, no paresthesias or swelling,
grip strength intact, and muscle strength at 5/5.  (R. at 567.)  He was advised to rest his hand for
a couple of days and provided a two-day work excuse at his request.  (*Id*.)  The emergency room
physician, Dr. Hinckley, noted that  "carpal tunnel syndrome is in the differential based on the
distribution of his pain and paresthesias," and reported his clinical impressions as "[r]ight hand
pain" and "[r]ight hand paresthesias."  (*Id*.)  Plaintiff was discharged to follow up with his
primary care physician and to return if his condition worsened.  (*Id*.)

Following a motor vehicle accident in November 2009, Plaintiff was seen in the
emergency department for back pain.  (R. at 908-26.)  Examination showed that Plaintiff had
mild to moderate spasm in the lower back, but retained good range of motion with normal
flexion, extension, and rotation.  (R. at 913.)

**3.    Livingston Lockbourne Family Health Center/Quirico Cristales, M.D.**

The record contains treatment notes from Livingston Lockbourne Avenue Family Health Center dated from January 28, 2008, through June 17, 2011.  (R. at 1084-1121.)  In March 2010, the physicians sent Plaintiff a warning letter regarding his "abusive actions involving the practice of seeking the care of and/or obtaining controlled medications from multiple physicians," noting that he had "been counseled regarding this behavior."  (R. at 1084.)  The most relevant note as to his physical impairment, dated May 9, 2011, demonstrates that Plaintiff's history showed deteriorating discs in his lower back.  Examination showed unrestricted range of motion in his lumbar spine, 5/5 strength in his extremities, and negative straight leg raise test.  Plaintiff was diagnosed with degenerative joint disease of the lumbar spine.  (R. at 1087-88.)

**4.    Joshua Harris, M.D.**

Dr. Harris examined Plaintiff for disability purposes on June 3, 2008.  (R. at 502-08.)  Dr. Harris found that Plaintiff was able to stand from the chair, get on and off the examination table, and heel/toe walk without difficulty.  He reported that Plaintiff did not walk with a limp or any antalgia and had full strength in his bilateral upper and lower extremities.  Physical examination of Plaintiff's back revealed no step-offs, deformities, or tenderness to palpation.  (R. at 503.)  Additionally, Plaintiff had full range of motion in his cervical and dorsolumbar spines.  Dr. Harris assessed chronic medial collateral ligament sprain, early medial compartmental osteoarthritis on his left knee, and possible osteocartilaginous or chondral defect of the medial compartment.  (R. at 504.)  Plaintiff reported that he had not had any surgery and that he had declined to receive recommended injections or to consider arthroscopy.  (*Id*.)  Dr. Harris noted that Plaintiff did have some slight opening of the medial side that "could account for part of his

instability even though the medial collateral ligament is an extraarticular ligamentous structure and does heal quite well on its own without any surgical intervention." (*Id.*) Dr. Harris indicated that if Plaintiff continued to be symptomatic and unstable subjectively, knee arthroscopy would be warranted to look for any loose bodies of cartilaginous flaps or possible meniscal tear. He found that Plaintiff had no problems using his left foot, entire right lower extremity, or hands. Dr. Harris further concluded that Plaintiff had no problem engaging in overhead activity or with his vision and hearing. Finally, Dr. Harris opined that Plaintiff could stand and/or sit for extended periods. (*Id.*)

     **5.**     **W. Jerry McCloud, M.D.**

In December 2009, state agency physician Dr. McCloud reviewed the file and assessed Plaintiff's physical functioning capacity. (R. at 767-74.) Dr. McCloud opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand/walk for six hours during an eight-hour day; sit for a total of six hours during an eight-hour day; occasionally kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. (R. at 768-69.) Dr. McCloud also determined that Plaintiff had a limited ability to push/pull with the lower extremities. (*Id.*) He opined that Plaintiff must avoid concentrated exposure to pulmonary irritants and extreme heat and cold and fumes, odors, dusts, gases, and areas of poor ventilation. (R. at 771.) Dr. McCloud found Plaintiff's allegations about his symptoms and their functional effect only partially credible. (R. at 772.) In April 2010, state-agency physician Maria Congbalay, M.D., reviewed the file and affirmed Dr. McCloud's assessment. (R. at 821.)

10

**6.    Ohio Correction of Rehabilitation and Correction/Correction Medical Center**

In October 2010, while incarcerated, Plaintiff underwent a right foot x-ray, which showed mild degenerative change in the first MP Joint.  The x-ray also revealed an old, healed fracture or stress fracture in the neck of Plaintiff's second metatarsal, but showed no current acute fracture, dislocation, or heel spur.  (R. at 1075.)

**B.    Mental Impairments**

**1.    Livingston Lockbourne Avenue Family Health Center**

The most relevant note concerning Plaintiff's alleged mental impairment demonstrates that he was diagnosed with anxiety disorder in March 2008.  (R. at 1117.)

**2.    Mark Hammerly, Ph.D.**

In November 2009, Dr. Hammerly conducted a psychological examination of Plaintiff on behalf of the Bureau of Disability Determination.  (R. at 490-99.)  Plaintiff reported that he believed he was disabled due to his knees, bipolar disorder, liver disease, Hepatitis C, panic disorder, and illiteracy.  (R. at 490.)  Plaintiff also reported he was in special education classes in school.  (R. at 491.)

During the mental status evaluation, Dr. Hammerly observed that Plaintiff's general mood was irritable with a flat affect.  He reported that Plaintiff related in a passive manner and that his level of cooperation was adequate.  IQ testing revealed a verbal IQ of 71, performance IQ of 76 and full-scale IQ of 71, which placed Plaintiff in the borderline range.  (R at 495.)

Dr. Hammerly diagnosed Plaintiff with dysthymic disorder, anxiety disorder not otherwise specified, and borderline intellectual function.  (R. at 497.)  He assigned Plaintiff a

Global Assessment of Functioning ("GAF") score of 51.[1]  (*Id.*)  Dr. Hammerly opined that

Plaintiff's abilities to relate to others and withstand the stress and pressures associated with day-

to-day work activity are moderately impaired.  He further opined that Plaintiff's abilities to

understand, remember, and follow instructions and maintain the attention, concentration,

persistence, and pace to perform simple, repetitive tasks are mildly impaired.  (R. at 497-98.)

### 3.  Scott Donaldson, Ph.D.

On November 23, 2011, Dr. Donaldson evaluated Plaintiff for disability purposes.  (R. at

761-64.)  Following a clinical interview and mental status examination, Dr. Donaldson

diagnosed Plaintiff with major depressive disorder and generalized anxiety disorder, assigning

him a GAF score between 45-55.  (R. at 764.)  Dr. Donaldson opined that Plaintiff's abilities to

relate to supervisors and coworkers, withstand the stress and pressures associated with day-to-

day work activity, and attend to relevant stimuli are moderately impaired.  He also opined that

although Plaintiff's abilities to perform repetitive tasks and understand, remember, and carry out

one or two-step instructions are not impaired, his level of motivation is moderately lacking.  (*Id.*)

### 4.  David Dietz, Ph.D.

On December 15, 2009, after review of Plaintiff's medical record, Dr. Dietz, a state-

agency psychologist, assessed Plaintiff's mental condition.  (R. at 786–803.)  Dr. Dietz opined

that Plaintiff was mildly limited in his activities of daily living and moderately impaired in

maintaining social functioning and in maintaining concentration, persistence, or pace.  He noted

---

[1]The GAF scale is used to report a clinician's judgment of an individual's overall level of
functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating whether the
individual is functioning at the higher or lower end of the range.  *See* Am. Psychiatric Ass'n, Diagnostic
and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34 ("DSM-IV-TR").  A GAF
score of 51-60 is indicative of "moderate symptoms . . . or moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.* at 34.

that Plaintiff had experienced no episodes of decompensation of an extended duration.  (R. at 796.)  He further determined that the evidence did not establish the presence of the "C" criteria. (R. at 797.)  In a narrative assessment of Plaintiff's ability to engage in work-related activities from a mental standpoint, Dr. Dietz found that Plaintiff was capable of completing 3 to 4 step tasks that do not have strict production standards and schedules or that would require more than superficial interactions with others.  (R. at 802.)  In April 2010, state-agency psychologist Joan Williams, Ph.D., reviewed the file and affirmed Dr. Dietz's assessment.  (R. at 820.)

## V.    THE ADMINISTRATIVE DECISION

On September 16, 2011, the ALJ issued his decision.  (R. at 8-18.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since June 24, 2009.  (R. at 10.)  The ALJ next found that Plaintiff had the following severe impairments: asthma, chronic obstructive pulmonary disease (COPD), left foot deformity, chronic medial collateral ligament (MCL) sprain of the left knee, early medial compartmental osteoarthritis of the left knee, lumbar degenerative disc disease, major depressive

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

| 1. | Is the claimant engaged in substantial gainful activity? |
|----|----|
| 2. | Does the claimant suffer from one or more severe impairments? |
| 3. | Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1? |
| 4. | Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work? |
| 5. | Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy? |

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

disorder, generalized anxiety disorder, and borderline intellectual functioning.  (*Id*.)  He further

found that Plaintiff did not have an impairment or combination of impairments that met or

medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (R. at 11.)  At step four of the sequential process, the ALJ evaluated Plaintiff's

residual functional capacity ("RFC").  The ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity (RFC) to perform light work as defined
> in 20 CFR 416.967(b) except that he can frequently balance and push/pull and
> operate foot pedals with the left lower extremity; occasionally stoop, kneel, crouch,
> crawl, and climb ladders, ropes, scaffolds, ramps and stairs; and must avoid
> concentrated exposure to extreme temperatures and pulmonary irritants like fumes,
> odors, dust, gases, poor ventilation.  The claimant is limited to simple, routine,
> repetitive tasks requiring no more than three or four steps in an environment that
> does not involve fast-paced production standards or strict time quotas.  Further,
> claimant should have occasional and superficial interaction with other but is capable
> of tolerating ordinary levels of supervision.

(R. at 12.)  The ALJ concluded that although Plaintiff's impairments could reasonably be

expected to cause his alleged symptoms, his statements concerning the intensity, persistence, and

limiting effects of his symptoms were not credible to the extent his statements were inconsistent

with the assigned RFC.  (R. at 14.)  In reaching this determination, the ALJ explicitly gave great

weight to the assessments of Drs. McCloud and Dietz, asserting that their opinions are supported

by clear rationale and consistent with the longitudinal medical history.  (R. at 15-16.)  The ALJ

also assigned "great weight" to the psychological evaluations of Drs. Hammerly and Donaldson,

asserting that their opinions were based upon an examining relationship and are supported by

clear rationale and the longitudinal medical evidence of record.  (R. at 16.)

Relying on the VE's testimony, the ALJ determined that there are jobs that exist in

significant numbers in the national economy that Plaintiff can perform.  (R. at 17-18.)  The ALJ

14

therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 18.)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial

15

right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.    ANALYSIS

In his Statement of Errors, Plaintiff posits that substantial evidence does not support the ALJ's step-five decision because the he erroneously relied upon VE testimony that was inconsistent with the Dictionary of Occupational Titles ("DOT").  He also submits that the ALJ's RFC determination was procedurally deficient.  This Report and Recommendation addresses Plaintiff's contentions of error in turn.

### A.    The ALJ's Reliance on the VE's Testimony

Within this contention of error, Plaintiff asserts that the ALJ erroneously relied upon the VE's testimony to conclude that a substantial number of jobs exist in the national economy that an individual with the limitations set forth in the RFC could perform.  According to Plaintiff, the limitations the ALJ set forth in his hypothetical to the VE, specifically the limitations of illiteracy and simple, routine, and repetitive tasks, fall between DOT's General Educational Development ("GED") reasoning development level of one and two.  At reasoning development level two, occupations might necessitate applying "commonsense understanding to carry out detailed but uninvolved written or oral instructions" and dealing with "problems involving a few concrete variables in or from standardized situations." 2 Dictionary of Occupational Titles app. C, at 1011 (4th ed. 1991).  Noting that the representative job titles the VE identified are GED development level of 2 under the DOT, Plaintiff opines that "it is impossible to know how many of the jobs bearing reasoning level two" could be performed by "an illiterate individual who was limited to 'simple, routine, repetitive tasks'" because the VE "provided no estimate of how many

16

. . . positions" and "offered no explanation for this deviation."  (Pl.'s Statement of Errors 6, ECF No. 11.)  Plaintiff concludes that the ALJ failed to meet his step five burden because he accepted the VE's testimony without attempting to resolve the foregoing conflict.

Plaintiff is correct that "[t]he Social Security Administration imposes an affirmative duty on ALJs to ask if the evidence they have provided 'conflicts with the information provided in the DOT.'"  *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009) (quoting SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000)).  Further, where the conflict between the DOT and the VE's testimony is apparent, the ALJ must further develop the record.  *Lindsley*, 560 F.3d at 606; SSR 00–4p.  An ALJ may choose to rely on VE testimony in complex cases, even where there is an apparent conflict, "given the VE's ability to tailor her finding to an 'individual's particular residual functional capacity.'"  *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168–69 (6th Cir. 2009) (quoting *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) and citing SSR 00–4p (noting that "[t]he DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE . . . may be able to provide more specific information about jobs or occupations than the DOT.")); *Lindsley,* 560 F.3d at 606.

In the instant case, the Undersigned concludes that the ALJ satisfied his burden.  As set forth above, after identifying representative jobs, the VE clarified that his testimony deviated from the DOT as follows:

> I'd like to say that, with regards to all three of these jobs, they have GED levels of at least a 1 or 2, and what that means is, in the DOT it says that for these jobs a person may have to recognize the meaning of 2,500 two- or three-syllable words, possibly have to read up to a rate of 95 to 120 words per minute.  However, I can say, based on my professional experience, that these jobs that I've given, the

17

> reduced – extremely reduced numbers that I've given, demand no reading
> whatsoever, no writing whatsoever.  So it does deviate from the DOT."

(R. at 93.)  After this explanation, the ALJ further queried: "Other than that explanation of

variance, has your testimony been consistent with information contained in the Dictionary of

Occupational Titles?"  (R. at 94-95.)  The VE then confirmed that the remainder of his testimony

was consistent with the DOT.  Plaintiff's counsel was afforded an opportunity to cross-examine

the VE, but declined.  (R. at 95.)  Under these circumstances, the ALJ properly relied upon the

VE's testimony in his step five analysis.  *See Louden v. Comm'r of Soc. Sec.*, No. 11-6037, 2012

WL 6028580, at *2 (6th Cir. Dec. 4, 2012) (internal citations omitted) ("The ALJ satisfied his

burden by asking the vocational expert if her testimony was consistent with the Dictionary of

Occupational Titles. [The claimant's] attorney had the opportunity, but failed to cross-examine

the [VE] regarding her position that her testimony was consistent with specific provisions of the

[DOT].  Accordingly, the [VE's] testimony constituted substantial evidence that [the claimant]

could perform her past relevant work . . . ."); *Beinlich,* 345 F. App'x at 168–69 ("[T]he ALJ is

under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry

mandated by SSR 00–4p.  This obligation falls to the plaintiff's counsel, who had the

opportunity to cross-examine the VE and bring out any conflicts with the DOT.  The fact that

plaintiff's counsel did not do so is not grounds for relief.").

**B.**     **The ALJ's RFC Determination**

Within this contention of error, Plaintiff asserts that the ALJ's RFC determination was

procedurally deficient for the following reasons: (1) it failed to account for Plaintiff's illiteracy;

(2) it failed to account for moderate limitations in attention, concentration, and persistence; (3) it

incorporated vague terminology; and (4) the limitations reflected the ALJ's reliance on outdated,

18

non-examining medical sources in violation of SSR 96-6p.  The Undersigned finds Plaintiff's arguments to be without merit.

### 1.    The Limitation of Illiteracy

To the extent the ALJ erred in failing to incorporate limitations into Plaintiff's RFC to reflect his illiteracy, such error was harmless.  In the hypothetical the ALJ posed to the VE, he explicitly asked the VE to assume an individual who was illiterate.  (R. at 90.)  The VE testified that the "extremely reduced numbers" he offered reflected only jobs that "demand[ed] no reading whatsoever, no writing whatsoever."  (R. at 93.)  The ALJ's RFC determination tracked the limitations he utilized in his hypothetical to the VE with the exception of the illiteracy limitation. In relying on the VE's testimony to conclude that Plaintiff is capable of performing work existing in significant numbers, however, the ALJ acknowledged his illiteracy and specifically noted that the VE had testified that "the numbers provided reflect only those positions where reading and writing is not required."  (R. at 18.)  Thus, at step five, the ALJ accounted for Plaintiff's illiteracy.

### 2.    Limitations in Attention, Concentration, and Persistence

Plaintiff next posits that the ALJ erred in failing to account for the moderate limitations in attention, concentration, and persistence that Dr. Dietz found given the ALJ's assignment of "great weight" to his opinion.  (Pl.'s Statement of Errors 9, ECF No. 11.)  This argument reveals Plaintiff's misunderstanding of the significance of those findings on the Mental Residual Functional Capacity Assessment form Dr. Dietz completed.  The Social Security Administration's Programs Operations Manual System ("POMS") clarifies that the "Moderately Limited" boxes Dr. Dietz checked are simply part of a worksheet that "does not constitute the

19

[doctor's actual] RFC assessment."  POMS DI § 24510.060(B)(2), *available at* https://secure.ssa. gov/apps10/poms.nsf/lnx/0424510060.  Checking the box "Moderately Limited" notes only that the claimant's capacity is impaired; it does not indicate the degree and extent of the limitation. *See id*. § 24510.063(B)(2).  Rather, the medical consultant must record "the actual mental RFC assessment" in Section III.  *Id*. at § 24510.060(B)(4).

In accordance with the foregoing directives, Dr. Dietz, in Section III of the Mental RFC Assessment form, recorded his mental RFC assessment, which was accompanied by a narrative discussion supporting his assessment.  (R. at 802.)  More specifically, Dr. Dietz opined that Plaintiff was "capable of completing 3 to 4 step tasks that do not have strict production standards or schedules and which [do] not require more than superficial interactions with others."  (*Id*.) Having accorded Dr. Dietz's opinion "great weight," the ALJ incorporated Dr. Dietz's Section III mental RFC assessment into his RFC determination.  (R. at 15–16.)  Accordingly, the ALJ did not err in his interpretation of Dr. Dietz's opinion.

### 3.    The RFC's Terminology

Plaintiff next contends that the language the ALJ utilized in his hypothetical to the VE and RFC is too vague to "clarify any actual degree of functioning or limitation."  (Pl.'s Statement of Errors 11, ECF No. 11.)  More specifically, he challenges the ALJ's incorporation of the following limitations: "concentrated exposure to extreme temperatures"; "simple, routine, repetitive tasks requiring no more than three or four steps"; and "does not involve fast-paced production standards or strict time quotas."  (*Id*. (citing R. at 12).)

This is simply not a viable argument.  As the Commissioner points out, all of these terms are commonly used by state-agency physicians and psychologists and also in Agency forms,

regulations, POMS, and rulings.  Further, the VE expressed no difficulty understanding and applying these limitations in connection with his identification of compatible employment. Finally, if Plaintiff's counsel found the ALJ's terminology to lack clarity, he was afforded an opportunity to ask the ALJ to clarify at the administrative hearing, but did not do so.

### 4.      Reliance on Dr. McCloud's Assessment

Plaintiff challenges the ALJ's assignment of "great weight" to Dr. McCloud's assessment, characterizing his opinion as "outdated" and "incomplete."  (Pl.'s Statement of Errors 12, 13 ECF No. 11.)  Plaintiff specifically takes issue with Dr. McCloud's finding that he has failed to establish manipulative limitations.  Plaintiff contends that Dr. McCloud, like the ALJ, failed to consider the treatment notes of examining physician Dr. Hinckley.  Plaintiff asserts that Dr. Hinckley treated his hand on two occasions, diagnosing him with carpal tunnel syndrome on the second.  Plaintiff, therefore, concludes that the ALJ's rejection of limitations attributable to carpal tunnel syndrome is not supported by substantial evidence.

The Undersigned finds Plaintiff's final argument to be equally unpersuasive as the first three.  Plaintiff has not demonstrated that Dr. McCloud's review of the file, which post-dated Dr. Hinckley's two emergency-room examinations, was "outdated."  In December 2007, Dr. Hinckley, the attending emergency department physician, first examined Plaintiff.  Plaintiff complained of right hand and left ankle pain he experienced after falling from a roof while hanging Christmas lights and decorations.  (R. at 583–85.)  Dr. Hinckley noted that Plaintiff was not experiencing any numbness or paresthesias in his hand and diagnosed him with right fifth metacarpal fracture and left ankle sprain.  (R. at 583–84.)  He advised Plaintiff to return if his condition worsened.  (R. at 583.)  The record contains no evidence showing that Plaintiff sought

additional treatment for his hand until February 25, 2009, when he presented to the emergency

room again with complaints of right hand parethesias and pain.  (R. at 566.)  Plaintiff reported a

spontaneous onset several days before the visit.  (*Id*.)  Consistently, just one week earlier, when

Plaintiff presented to the emergency room with a toe fracture after dropping a washer on his foot,

he did not complain of pain in his hand.  (R. at 565.)  Dr. Hinckley's examination revealed that

Plaintiff had full range of motion of his wrist, could wiggle his fingers, full sensation, no

paresthesias or swelling, grip strength intact, and muscle strength at 5/5.  (R. at 567.)  Plaintiff

did, however, report "some tingling."  (*Id*.)  Dr. Hinckley noted that "carpal tunnel syndrome is

in the differential based on the distribution of his pain and paresthesias."  (R. at 566.)  He

diagnosed "[r]ight hand pain" and "[r]ight hand paresthesias."  (*Id*.)  Plaintiff was discharged to

follow up with his primary care physician and advised to rest his hand for a couple of days and

to return if his condition worsened.  (R. at 566–67.)  The record contains no evidence

demonstrating that Plaintiff followed up with his primary care physician or that he otherwise

sought further treatment for his right hand.  Thus, Dr. McCloud's review cannot be considered

outdated given that he performed it months after Plaintiff's February 2009 visit and the record

contains no further evidence relating to his alleged hand pain.

Further, Dr. McCloud's failure to discuss Dr. Hinckley's examination notes does not

render his assessment incomplete.  Contrary to Plaintiff's assertion, and consistent with the

ALJ's decision, Plaintiff has never been diagnosed with carpal tunnel syndrome, and the record

evidence does not demonstrate that Plaintiff experienced right hand pain for a continuous period

of twelve months.  (*See* R. at 11 (noting that the records does not contain a diagnosis of carpal

tunnel syndrome from an acceptable medical source or evidence showing that Plaintiff's hand

pain lasted at a severe level for a continuous period of 12 months).)  Rather, Plaintiff reported in February 2009 that he had "no problems" with his hand since his December 2007 fracture and that he had only been experiencing hand pain for four days.  (R. at 567.)  Dr. Hinckley did not note any limitations and advised Plaintiff to rest his hand for only a "couple days."  (*Id.*)  The record contains no objective evidence suggesting that Plaintiff continued to experience pain in his right hand.  To the contrary, in December 2009, when Plaintiff presented with a left hand finger sprain after falling off a ladder while hanging Christmas lights, he did not report any pain in his right hand, and examination did not reveal carpal tunnel syndrome in either hand.  (R. at 880-85.)  Nor did Plaintiff report hand pain when he presented to the emergency room later that month with back pain after falling off a dirt bike.  (R. at 874-79.)  As the Commissioner notes, until the administrative hearing in July 2011, where Plaintiff alleged suffering from carpal tunnel syndrome since 2007, he had not alleged disabling hand issues.  Under these circumstances, the ALJ did not err in relying on Dr. McCloud's assessment or in failing to incorporate limitations attributable to carpal tunnel syndrome in Plaintiff's RFC.

## VIII.    CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## IX.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date:  February 8, 2013                              /s/ *Elizabeth A. Preston Deavers*
                                                   Elizabeth A. Preston Deavers
                                                   United States Magistrate Judge

24